No. 24-2778

---

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

TOHONO O'ODHAM NATION, ET AL.,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF THE INTERIOR, ET AL.,
Defendants-Appellees,

and

SUNZIA TRANSMISSION, LLC,
Intervenor-Appellee

---

Appeal from the United States District Court for the District of Arizona
Honorable Jennifer G. Zipps (No. 4:24-cv-00034-JGZ)

---

## EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL UNDER CIRCUIT RULE 27-3; RELIEF REQUESTED BY MAY 10, 2024

---

Howard Shanker, Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

Alexander B. Ritchie, Attorney General
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
alex.ritchie@scat-nsn.gov
(928) 475-3344

William S. Eubanks II
Elizabeth L. Lewis
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
bill@eubankslegal.com
lizzie@eubankslegal.com
(202) 618-1007

*Counsel for Center for Biological Diversity and Archaeology Southwest*

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs Tohono O'odham Nation and the San Carlos Apache Tribe are sovereign Nations. Plaintiffs Center for Biological Diversity and Archaeology Southwest are nonprofit corporations with no parent companies or stock.

## CIRCUIT RULE 27-3 CERTIFICATE

Pursuant to Circuit Rule 27-3, undersigned counsel certifies the following:

**(i)          Attorneys' Names and Contact Information**

Plaintiffs-Appellants Tohono O'odham Nation, *et al.*, are represented by:

Howard Shanker, Attorney General
Tohono O'odham Nation
P.O. Box 830
Sells, Arizona 85634
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

*Attorney for the Tohono O'odham Nation*

Alexander B. Ritchie, Attorney General
San Carlos Apache Tribe
P.O. Box 40
San Carlos, Arizona. 85550
alex.ritchie@scat-nsn.gov
(928) 475-3344

*Attorney for the San Carlos Apache Tribe*

William S. Eubanks II
bill@eubankslegal.com

Elizabeth L. Lewis
lizzie@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 618-1007

*Attorneys for Plaintiffs Center for Biological Diversity
and Archaeology Southwest*

      Defendants-Appellees Bureau of Land Management, *et al.*, are represented by:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Amber Dutton-Bynum
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Amber.Dutton-Bynum@usdoj.gov
(202) 305-0465

Devon Lehman McCune
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., S. Terrace, Suite 370
Denver, CO 80026
Devon.McCune@usdoj.gov
(303) 844-1487

      Defendant-Intervenor-Appellee SunZia Transmission, LLC is represented by:

Svend Brandt-Erichsen
NOSSAMAN LLP
719 Second Ave., Ste. 1200
Seattle, WA 98104
sbrandterichsen@nossaman.com
(206) 395-7630

Brian Imbornoni
NOSSAMAN LLP
Two North Central Avenue, Suite 1715
Phoenix, AZ 85701
bimbornoni@nossaman.com
(480) 790-5900

Hilary Tompkins
HOGAN LOVELLS US LLP
555 13th Street N.W.
Washington, DC 20004
hilary.tompkins@hoganlovells.com
(202) 664-7831

### (ii)     Facts Showing the Existence and Nature of the Emergency

With authorization from the Bureau of Land Management, Intervenor SunZia Transmission, LLC is constructing an extraordinarily intrusive transmission line in Arizona's San Pedro Valley, slicing right through the heart of ancestral lands and properties of immense cultural significance to the Tohono O'odham Nation, the San Carlos Apache Tribe, and other Native American Tribes who have occupied these lands for millennia. As Plaintiffs' declarations establish, construction is causing ongoing, irreparable harm to these sacred lands and properties, as well as Plaintiffs' deep and longstanding cultural, historic, and religious interests in them.

Intervenor is rapidly constructing this project even though the Bureau of Land Management has never conducted the requisite surveys to identify (let alone consider measures to avoid) culturally significant landscapes and other traditional cultural properties in the San Pedro Valley, which receive certain protections under federal law

(i.e., the National Historic Preservation Act). Because construction is at an advanced stage, *see* ER023 at n.1, this Court's immediate intervention is necessary to avoid the irreversible desecration and destruction of critically important Tribal properties and cultural landscapes before the Court can address the merits of Plaintiffs' legal claims.

The immediate need for emergency relief is made even more exigent by the fact that Intervenor recently transitioned from preliminary (albeit extremely harmful) construction activities—e.g., vegetation clearing, grading, and road construction—to erecting massive, commercial-scale transmission towers in the culturally significant landscape of the San Pedro Valley. Without an emergency injunction from this Court, Intervenor will race to finish erecting the remaining towers so that it may string and electrify this transmission line before the Court can resolve Plaintiffs' appeal.

**(iii)      Why the Motion Could Not Be Filed Earlier**

Plaintiffs filed this lawsuit on January 17, 2024, and filed a motion for a temporary restraining order and/or a preliminary injunction on January 30, 2024. After briefing, the district court held a hearing on March 13, 2024, and it issued its order denying relief on April 16, 2024. On April 24, 2024, Plaintiffs filed their notice of appeal immediately after obtaining internal approval to do so, and that day Plaintiffs also filed in the district court a motion for an injunction pending appeal. On May 1, 2024, the district court denied Plaintiffs' motion.

iv

**(iv)     Notice and Service on Opposing Counsel**

In compliance with FRAP 8(a)(2), Plaintiffs' April 24, 2024 notice of appeal and motion for an injunction pending appeal in the district court gave Defendants and Defendant-Intervenor advance notice of this motion. Plaintiffs' counsel will email a PDF copy of this motion to Defendants' and Intervenor's counsel immediately after it is filed.

**(v)     Whether Relief Was First Sought in the District Court**

Plaintiffs filed an emergency motion for an injunction pending appeal in the district court on April 24, 2024. On May 1, 2024, the district court denied the motion.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT.................................................. i

CIRCUIT RULE 27-3 CERTIFICATE............................................................ i

TABLE OF CONTENTS ................................................................ vi

TABLE OF AUTHORITIES ........................................................... vii

LIST OF ACRONYMS.................................................................... x

INTRODUCTION.......................................................................... 1

BACKGROUND............................................................................. 2

    I.   Summary of BLM's Decisionmaking Process .......................... 2

    II.  Proceedings Below........................................................ 7

ARGUMENT .................................................................................. 8

    I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OR AT LEAST HAVE RAISED SERIOUS QUESTIONS ......................................... 9

      A.  Plaintiffs' Claims Are Timely and Challenge the Final Agency Actions (the LNTPs) that Consummated the NHPA Process........................................ 9

      B.  BLM Failed To Comply With Its NHPA Obligations ..................................... 14

    II.  PLAINTIFFS ARE SUFFERING IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.................................................... 18

    III. THE EQUITIES AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF TEMPORARILY DELAYING CONSTRUCTION.............................. 20

CONCLUSION ...................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ........................................................ 8

*Battle Mountain Band of Te-Moak Tribe of W. Shoshone Indians v. Bureau of Land Mgmt.*, 302 F. Supp. 3d 1226 (D. Nev. 2018) .................................... 17

*Bennett v. Spear*,
 520 U.S. 154 (1997) ............................................................... 11, 12

*Cal. Sea Urchin Commission v. Bean*,
 828 F.3d 1046 (9th Cir. 2016) ...................................................... 13

*Colo. River Indian Tribes v. Marsh*,
 605 F. Supp. 1425 (C.D. Cal. 1985) ............................................... 21

*Creech v. Idaho Comm'n of Pardon & Parole*,
 94 F.4th 851 (9th Cir. 2024) ......................................................... 9

*Feldman v. Ariz. Sec'y of State's Off.*,
 843 F.3d 366 (9th Cir. 2016) ........................................................ 8

*Hammond v Norton*,
 370 F. Supp. 2d 226 (D.D.C. 2005) ............................................... 12

*League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*,
 752 F.3d 755 (9th Cir. 2014) ........................................................ 20

*Mach Mining, LLC v. EEOC*,
 575 U.S. 480 (2015) ................................................................. 14

*Mont. Wilderness Ass'n v. Fry*,
 310 F. Supp. 2d 1127 (D. Mont. 2004) ........................................... 20

*Northern Cheyenne Tribe v. Norton*,
 503 F.3d 836 (9th Cir. 2007) ........................................................ 12

*Pom Wonderful LLC v. Hubbard*,
 775 F.3d 1118 (9th Cir. 2014) ........................................................ 8

vii

*Pres. Coal., Inc. v. Pierce,*
   667 F.2d 851 (9th Cir. 1982) ...................................................................... 3

*Quechan Tribe of the Fort Yuma Indian Reserv. v. U.S. Dep't of Interior,*
   755 F. Supp. 2d 1104 (S.D. Cal. 2010) ................................................... 18

*S. Fork Band Council of W. Shoshone of Nev. v. Dep't of the Interior,*
   588 F.3d 718 (9th Cir. 2009) .................................................................... 21

*Snoqualmie Valley Preserv. All. v. U.S. Army Corps of Eng'rs,*
   683 F.3d 1155 (9th Cir. 2012) .................................................................. 13

*Stitt v. Williams,*
   919 F.2d 516 (9th Cir. 1990) .................................................................... 14

*Tyler v Cisneros,*
   136 F.3d 603 (9th Cir. 1998) .................................................................... 14

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) .................................................................................. 11

*Wind River Mining Corp. v. United States,*
   946 F.2d 710 (9th Cir. 1991) .................................................................... 14

**Statutes**

5 U.S.C. §§ 701-706 ........................................................................................ 8

28 U.S.C. § 2401 ........................................................................................... 10

42 U.S.C. §§ 4321-4347 ................................................................................... 1

42 U.S.C. § 4332 ............................................................................................. 3

43 U.S.C. §§ 1701-1787 ................................................................................... 2

54 U.S.C. §§ 300101-307108 ........................................................................... 1

54 U.S.C. § 300320 ......................................................................................... 3

54 U.S.C. § 306108 ......................................................................................... 3

**Regulations**

36 C.F.R. § 800.1 ............................................................................................... 3, 18

36 C.F.R. § 800.2 ................................................................................................... 15

36 C.F.R. § 800.4 ............................................................................................... 4, 15

36 C.F.R. § 800.6 ................................................................................................... 15

40 C.F.R. § 1505.2 ................................................................................................... 3

43 C.F.R. § 2807.10 ........................................................................................... 6, 12

## <u>LIST OF ACRONYMS</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| LNTP | Limited Notice to Proceed |
| PA | Programmatic Agreement |
| ROD | Record of Decision |
| ROW | Right of Way |
| TCP | Traditional Cultural Property |
| THPO | Tribal Historic Preservation Officer |

## **INTRODUCTION**

As authorized by Defendant Bureau of Land Management ("BLM"),
Intervenor SunZia Transmission, LLC ("Intervenor") is now rapidly constructing a
massive transmission line through the heart of the San Pedro Valley ("the Valley"),
which is one of the most culturally significant landscapes for the Tohono O'odham
Nation, the San Carlos Apache Tribe, and other Native American Tribes who have
occupied these ancestral lands for millennia. In the absence of an injunction pending
appeal, these sacred lands and properties that are critically significant to the history,
culture, and religion of these Tribes will be permanently desecrated and irretrievably
destroyed. Thus, emergency relief is necessary to avoid irreparable harm to Plaintiffs,[1]
and the equities and public interest support such relief.

The district court denied emergency injunctive relief without addressing the
irreparable harm to the Tribes, the balance of equities, or the public interest. Rather,
the court based the ruling on its legal determination that Plaintiffs' claims under the
National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-307108, were
barred by the statute of limitations because BLM issued a Record of Decision
("ROD") in 2015 pursuant to the National Environmental Policy Act ("NEPA"), 42
U.S.C. §§ 4321-4347. To reach this result, the court misconstrued Plaintiffs' claims as

---

[1] "Plaintiffs" are the Tohono O'odham Nation, San Carlos Apache Tribe, Center for
Biological Diversity, and Archaeology Southwest.

1

challenging BLM's route-setting decision in that 2015 ROD, rather than a challenge to BLM's failure to satisfy its consultation obligations under Section 106 of the NHPA.

However, as explained below, the Tribes were told at that time that BLM was *not* resolving NHPA issues with the ROD, but rather, that detailed surveys for historic and cultural resources would be completed after initially establishing the route in the ROD. Plaintiffs were repeatedly assured that such surveys *would* be conducted—in close coordination with the Tribes—before any decision was made to proceed with construction and that the Project could be "realigned" if necessary to avoid destroying or degrading areas of significant value to the Tribes. Under these circumstances, the district court's holding that the Tribes' NHPA claims are barred is not only clearly wrong as a legal matter, it is egregiously unfair to Tribes that took BLM at its word.

The U.S. government has a tragic history of destroying Native American lives and lands to cater to economic interests. This time, Plaintiffs simply ask that they be heard in court *before* their important ancestral lands and culture are permanently destroyed. Especially given the tenuous basis for the ruling below—and the fact that BLM told Plaintiffs that it would meaningfully address their concerns one day (a day that never came)—an injunction pending appeal is the only equitable outcome.

## BACKGROUND

## I.    SUMMARY OF BLM'S DECISIONMAKING PROCESS

This case involves BLM's issuance of a right-of-way ("ROW") under the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787, for the SunZia

2

Southwest Transmission Line ("the Project") through the heart of the Valley. The Valley is one of the most intact cultural landscapes in the Southwest, and has provided immense spiritual meaning and value to the Plaintiff Tribes (and other Tribes) for millennia. Members of these Tribes claim strong ancestral connections to the Valley and continue to hold and foster deep relationships with the area that are an inseparable part of their respective communities' cultural identities, collective histories, and continuing spiritual observances.

Because the Project is both an "undertaking" under the NHPA, 54 U.S.C. § 300320, and a "major federal action" under NEPA, BLM had to comply with its distinct obligations under both statutes. *Cf. Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982) ("[C]ompliance with the NHPA . . . does not ensure compliance with NEPA."). The NHPA required BLM to undergo Section 106 consultation to "take into account the effect" of the "undertaking" on historic properties, *id.* § 306108, by first identifying such resources and then "consider[ing] . . . alternatives to avoid, minimize, and mitigate the undertaking's adverse effects on historic properties," 36 C.F.R § 800.1(c). Separately, NEPA required BLM to prepare an Environmental Impact Statement ("EIS") to examine the environmental effects of this action and alternatives for reducing such effects, 42 U.S.C. § 4332(C), and then document its consideration of such effects and alternatives in a ROD, *see* 40 C.F.R. § 1505.2.

BLM consummated its NEPA process in 2015 by issuing a ROD documenting its decision to grant Intervenor an ROW for the Project. Relevant here, the 2015

3

ROD selected Intervenor's preferred route through the Valley. However, in preparing its EIS and issuing the ROD, BLM expressly deferred Section 106 consultation under the NHPA until *after* the ROD and ROW had been issued. The ROD specified that BLM's compliance with the NHPA, through the procedures established by the 2014 Programmatic Agreement ("PA"), "will be completed **after** the *ROD and right-of-way* permit are issued, *but prior to project construction . . . .*" ER221 (emphases added); *see also* ER209 ("Cultural resources will continue to be considered during post-EIS phases of Project implementation in accordance with the executed PA," which "would involve intensive surveys to inventory and evaluate cultural resources").

The terms of 2014 PA specified that in the post-ROD Section 106 consultation process, BLM would use established methods (as set forth in BLM Manual H-8110 and National Register Bulletin 38) to identify culturally significant landscapes and other traditional cultural properties ("TCPs"), *see* 36 C.F.R. § 800.4(a), and consider measures, including "realignment of the transmission line," to avoid adverse effects to any TCPs. ER136-37; *see also* ER143-44. Representations by BLM and Intervenor both before and after BLM's issuance of the PA and ROD only reinforced that the post-ROD Section 106 process would fully address Plaintiffs' concerns with the Project's route by identifying and considering measures to avoid effects to TCPs. *See, e.g.*, ER225-26 (BLM "agree[ing]" in 2009 to consider an "ethnographic overview"); ER227 (BLM confirming in 2018 that it "agreed to do [a cultural landscape study] separate from the class III [archaeological survey]," and it "expect[ed] to have a

4

separate report for the cultural landscape study"); ER294 (Intervenor representing in a state proceeding that a "cultural landscape study *shall be conducted* to fully evaluate the impacts of the Project on the cultural landscape prior to the commencement of construction, *pursuant to and as required by the PA*" (emphases added)).

As to the scope of BLM's post-ROD Section 106 consultation process, BLM made clear in 2013 that it was "*not* in a position to reroute" the Project to avoid cultural resources prior to issuing the ROD; instead, BLM stated that the post-ROD NHPA process pursuant to the PA "should be broad enough and flexible enough to allow for *all manner of avoidance and mitigation*." ER127 (emphases added).

After issuing the ROD, however, BLM conducted a strictly archaeological survey (i.e., a "Class III survey") to identify individual sites, but it *never* conducted the long-promised cultural landscape study or utilized any other established method, as required by the PA, to identify much broader cultural landscapes or other TCPs. *See, e.g.*, ER257-69. While they awaited a final BLM action under the NHPA, Plaintiffs continued to urge BLM to conduct a cultural landscape study to identify cultural landscapes and other TCPs that Plaintiffs believe to exist in the Valley. *Id.*; *see also* ER027-29 (noting twenty-one occasions Plaintiffs asked BLM for such a study).[2]

---

[2] BLM's Manual recognizes the distinction between TCPs and other resources, acknowledging that cultural landscapes and other TCPs "are not identified using survey methods analogous to archaeological survey"; rather, they are "identified by consulting with the cultural groups known to have traditional interests in the target area" through "interviews connected with class III inventories, ethnographic studies, oral testimony, or other sources of reliable information." BLM, Manual 8110 at .22.D,

5

On September 26, 2023, after Plaintiffs' insisted for fourteen years that BLM conduct a cultural landscape study to comply with the NHPA and the PA, and despite Plaintiffs' repeated submission of evidence indicating the existence of a TCP in the Valley, *see, e.g.*, ER257-69, BLM issued a decision that, for the first time, authorized actual construction in the Valley. BLM issued this decision—a Limited Notice to Proceed ("LNTP"), ER159—without conducting a cultural landscape study or using other established tools to identify TCPs (let alone considering measures to avoid effects to TCPs). The LNTP is predicated on BLM's arbitrary determination under the NHPA that "there are no historic properties [including TCPs] present in the transmission structure spans and roads subject to this LNTP." *Id.*

The decision embodied in the LNTP marked the first time that BLM issued *any* determination either that it had complied with its NHPA obligations or that TCPs did not exist in the Valley. This decision also fundamentally altered the legal regime by authorizing Project construction that was previously prohibited. *See* ER191 (BLM's 2015 ROD stating that "[t]his Decision *does not authorize the Applicant to commence construction* of any project facilities . . . . *until the Applicant*, in accordance with 43 CFR 2807.10, receives and accepts the [ROW] grant, *and also receives a written Notice to Proceed* . . . that *must be approved* by BLM's Authorized Officer." (emphases added)).

---

.51, https://www.blm.gov/policy/manuals. "Consultation to identify [TCPs] should always precede field survey." *Id.* at .22.D. BLM never did so for this Project.

6

## II.  PROCEEDINGS BELOW

After a brief attempt to administratively resolve their disputes regarding BLM's failed NHPA compliance—which resulted in BLM suspending the LNTP before later reinstating it, ER160-61—Plaintiffs filed this case alleging that BLM acted arbitrarily, capriciously, and contrary to law in issuing the LNTPs, and thus authorizing construction in the Valley, without complying with the NHPA's obligations. Specifically, Plaintiffs challenged BLM's failure to make a reasonable, good-faith effort to identify TCPs or to consider measures for avoiding effects to any TCPs ultimately identified. Plaintiffs also challenged BLM's failure to engage in meaningful government-to-government consultation with the Plaintiff Tribes regarding the consideration and identification of TCPs, as required by the NHPA. *See* ER089-91.[3]

To avoid irreparable harm to ancestral lands and culturally significant landscapes, on January 30, 2024, Plaintiffs moved for a temporary restraining order and/or a preliminary injunction to halt construction. Plaintiffs submitted detailed declarations from Tribal members and others attesting to the severe, permanent harm resulting directly from the LNTPs. *See* ER094-106; ER107-12; ER113-26; ER162-82; ER228-39; ER240-56; ER257-80.

---

[3] The ruling below frames Plaintiffs' claims as "seek[ing] to reroute the Project out of the [Valley]," ER009-10. But Plaintiffs' Complaint seeks only to vacate the LNTPs and order BLM to conduct further NHPA-required process to identify TCPs and then consider measures to avoid effects to TCPs. *See* ER091-92. Whether BLM would ultimately deem routing adjustments necessary is *not* at issue in this lawsuit.

7

After a hearing, the district court denied Plaintiffs' motion on April 16, 2024, addressing only Plaintiffs' likelihood of success on the merits. ER001-22. The principal basis for the ruling is that Plaintiffs were challenging BLM's route-setting decision in the 2015 ROD and should have asserted their NHPA claims within six years of that ROD, as required by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706—even though BLM told the Tribes it was not addressing NHPA compliance at that time. Plaintiffs immediately appealed and asked the district court to issue an injunction pending appeal, which the district court denied. *See* ER023-25.

## ARGUMENT

"The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). The moving party must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). This Court applies a sliding scale test, where a movant is entitled to an injunction if it shows "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff," so long as the plaintiff also shows that there is a likelihood of irreparable harm and an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). As set forth below, Plaintiffs easily satisfy each of these elements.

8

Moreover, although this Court ordinarily "review[s] the denial of a preliminary injunction for abuse of discretion," it must "review de novo the underlying issues of law." *Creech v. Idaho Comm'n of Pardon & Parole*, 94 F.4th 851, 854 (9th Cir. 2024). Because the district court limited its ruling to the legal merits of Plaintiffs' claims and did not address the parties' equitable arguments, the Court's review here is de novo.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OR AT LEAST HAVE RAISED SERIOUS QUESTIONS

Plaintiffs are likely to prevail, or at least have raised serious questions, as to their claim that BLM arbitrarily authorized Project construction in the Valley by issuing the LNTPs without first satisfying its NHPA obligations, because it neither conducted the requisite surveys to identify cultural landscapes and other TCPs, nor meaningfully considered alternatives to avoid, minimize, and mitigate the Project's effects to TCPs. The district court's central holding—i.e., that Plaintiffs' challenge is untimely because BLM's 2015 ROD under NEPA triggered the APA's statute of limitations for any *NHPA* claims accruing *after* the ROD, ER009-13—is erroneous.

### A.   Plaintiffs' Claims Are Timely and Challenge the Final Agency Actions (the LNTPs) that Consummated the NHPA Process

The key issue raised by this appeal is whether Plaintiffs' challenges are time barred when BLM, *for the first time*, purported to complete its NHPA obligations in 2023, by issuing the LNTPs that authorized construction in the Valley.

The district court held that BLM's 2015 issuance of a ROD under NEPA constituted the focal point of judicial review for *all* challenges to BLM's Project-

9

related actions, even those arising under other laws that had not been completed at the time of the ROD and thus could not accrue until *after* the ROD, let alone crystallize into final agency action of any legal consequence until 2023. This counterintuitive ruling is wrong. Controlling authority—not to mention logic and basic fairness—strongly support the conclusion that Plaintiffs timely acted under the APA's statute of limitations by filing suit mere months after BLM issued the LNTPs, which is well "within six years after the right of action [under the NHPA] first accrue[d]." 28 U.S.C. § 2401(a). Indeed, the district court's holding (and BLM's argument) that the statute of limitations for filing Plaintiffs' NHPA claims began to run *before it completed the NHPA process* makes no legal or logical sense.

BLM argues—and the ruling below agreed—that the 2015 ROD started the statute of limitations for *all* Project-related claims that had already accrued (e.g., NEPA claims) and that *might* later accrue after the ROD. But the ROD expressly *declined* to resolve NHPA issues, instead deferring those distinct obligations to subsequent BLM actions that "will be completed after the ROD . . . but prior to Project construction." ER221. Nor does the ruling address the fact that BLM told Plaintiffs it was "not in a position to reroute" the Project on cultural resource grounds before issuing a ROD, ER127, and that, instead, BLM would: (1) conduct a post-ROD cultural landscape study under the NHPA to identify TCPs in the Valley, *see* ER136-37; ER143-44; ER226; ER227; ER294, and (2) consider "all manner of

10

avoidance and mitigation" of effects to TCPs, ER127, including "realignment of the transmission line," ER136.

As a matter of law, therefore, BLM's 2015 ROD under NEPA could *not* serve as BLM's "last word on the matter in question." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). As it concerns BLM's post-ROD compliance with the NHPA or the existence of TCPs, the ROD was neither "'final'" nor "reviewable" under the APA and could not have been until BLM took some action demonstrating its completion of those deferred obligations. *Id.* The LNTPs signify just that.

Here, the LNTPs served as BLM's "last word" (and its *only* word) that it had satisfied its duties under the NHPA and the PA, including its obligation to identify and consider alternatives to avoid cultural landscapes and other TCPs in the Valley, despite never having attempted to identify TCPs using established methods for doing so. *See* ER159-61. Indeed, BLM admitted months before issuing the LNTPs that "an inventory for TCPs has not been completed at this time." ER158.

And, unlike the ROD that *prohibited* construction, ER191, the LNTPs altered the legal regime by immediately authorizing construction in the Valley that could not occur prior to the LNTPs—authorization expressly predicated on BLM's arbitrary finding under the NHPA that "there are no historic properties [including TCPs] present in the transmission structure spans and roads subject to this LNTP." ER159. Thus, for an NHPA challenge, the 2023 LNTPs—*not* the 2015 ROD—are the final reviewable actions under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (an

11

action is final and reviewable only if it marks the "consummation" of the agency's decisionmaking process on that subject, and "rights or obligations have been determined," or "legal consequences will flow" from the decision).[4]

This Court's precedents strongly reinforce that the LNTPs triggered judicial review of Plaintiffs' NHPA claims and that Plaintiffs timely filed suit. In *Northern Cheyenne Tribe v. Norton*, the Court resolved the Tribe's NEPA claims, but dismissed its NHPA claims as "unripe" because, as here, the ROD and EIS provided for post-ROD "consultation with tribes as required by the [NHPA]," and there was not yet "a specific final agency action [that] has an actual or immediately threatened effect" on cultural resources. 503 F.3d 836, 845-46 (9th Cir. 2007). Thus, if Plaintiffs had filed suit challenging the ROD in 2015—*before* BLM completed its NHPA obligations— Circuit precedent would have required *dismissal* as unripe and/or lacking final agency action. In cases where an agency takes more than six years between issuing its ROD and its LNTP, as here, the ruling below thus puts Tribes in an untenable Catch-22.

---

[4] For the same reasons that the LNTPs satisfy the *Bennett* factors as to Plaintiffs' NHPA claims, the LNTPs were not ministerial acts that "simply indicated that all pre-construction conditions were met." ER013. The PA made clear that BLM retained discretion to issue LNTPs, and could do so *only* if it determined, in compliance with the NHPA, that "such authorizations will not restrict . . . measures to avoid, minimize, or mitigate the adverse effects to historic properties through rerouting of the corridor." ER142; *see also* 43 C.F.R. § 2807.10 (stating that "you may not initiate construction" under a ROW grant "until BLM issues you a notice to proceed"); *Hammond v Norton*, 370 F. Supp. 2d 226, 256 (D.D.C. 2005) (noting that BLM's actions in issuing an LNTP "are not 'purely ministerial' because BLM still retains discretion to halt the [project] should [the applicant] not meet its [legal] obligations").

Likewise, in *California Sea Urchin Commission v. Bean*, this Court found that "the operative agency action" was the later "*decision* to terminate [a] program" and not an earlier decision granting "the *authority* to terminate the program," and therefore the suit was not time-barred. 828 F.3d 1046, 1049-52 (9th Cir. 2016). The Court reasoned that while the earlier decision notified the public that the agency "*may* at some later date terminate the program, the operative agency action did not happen until 2012, when [the agency] *actually* terminated the program." *Id.* at 1050. The ruling was "supported by pragmatic concerns"; if the earlier decision was the linchpin for judicial review, any suit within six years of that decision "would necessarily have been theoretical," and it would later "wall off the agency from any challenge on the merits." *Id.* at 1051-52; *see also Snoqualmie Valley Preserv. All. v. U.S. Army Corps of Eng'rs,* 683 F.3d 1155, 1159 (9th Cir. 2012) (finding plaintiffs timely pursued claim where the relevant agency action had not yet occurred "during [prior] judicial review" of different action for that project, and thus "could not have been raised" previously).

The same is true here. While the 2015 ROD addressed BLM's NEPA compliance (and triggered the statute of limitations for any *NEPA* claims), only later did BLM purport to resolve BLM's *NHPA* compliance, culminating in BLM's authorization of actual construction shortly before the Tribes filed suit. In practical terms, BLM told the Tribes during the NEPA process that it was too early to challenge the agency's compliance with the NHPA, only to turn around later and say

13

it is now too late. This *"heads, I win; tails, you lose"* approach—an all too familiar refrain for Tribes throughout the nation's history—must be rejected.[5]

Contrary to the ruling below, Plaintiffs timely challenged the LNTPs—the operative, final BLM decisions for NHPA purposes. *Accord Tyler v Cisneros*, 136 F.3d 603, 608-09 (9th Cir. 1998) (finding post-funding NHPA claims timely, where an agency entered into an agreement comparable to a PA, made binding commitments, and thus had "continuing authority over the project").[6]

### B.    BLM Failed To Comply With Its NHPA Obligations

The district court's erroneous timeliness holding fatally infected its decision to deny preliminary injunctive relief. Although this is sufficient for this Court to grant emergency relief while the Court considers this appeal, Plaintiffs will also briefly address the underlying merits of their NHPA claim.

---

[5] This Court's precedents animate the "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015).

[6] Although Plaintiffs timely challenged the LNTPs, this is also a textbook case in which equitable estoppel and equitable tolling of the APA's statute of limitations would apply, especially in light of BLM's repeated assurances that it would later conduct a proper study to identify TCPs and consider avoiding effects to them, which it then failed to do. *See, e.g.*, *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991) ("The government should not be permitted to avoid all challenges to its actions . . . simply because the agency took the action long before anyone discovered the true state of affairs."); *Stitt v. Williams*, 919 F.2d 516, 522-23 (9th Cir. 1990) ("[E]quitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's statements or conduct in failing to bring suit.").

14

Under the NHPA, BLM must: (1) identify *all* relevant properties that may be affected, including cultural landscapes and other TCPs, in consultation with Tribes, 36 C.F.R. §§ 800.2, 800.4(a); and (2) "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects," *id.* § 800.6(a). It is well-established—including in the PA, BLM's Manual H-8110, and National Register Bulletin 38—that identifying TCPs materially differs from the more superficial surveys used to identify archaeological sites. *See supra* at 4-5. Yet, despite Plaintiffs' repeated urging for BLM to identify TCPs through a cultural landscape study and other established methods, and their concomitant submission of extensive evidence indicating the existence of TCPs in the Valley, BLM issued the LNTPs without conducting such a study, let alone following up on Plaintiffs' information to ascertain the existence of any TCPs. *See* ER257-69; ER158 (BLM acknowledging in 2023 that "an inventory for TCPs *has not been completed* at this time" (emphasis added)).

BLM's excuses for flouting its NHPA duties do not pass muster. First, contrary to BLM's argument below, *archaeological* surveys are *not* a proper method for identifying cultural landscapes and other TCPs, as BLM's Manual makes clear. *See* Manual 8110 at .22.D, .51. This is why the PA required the use of *other* methods to identify TCPs, pursuant to the standards set forth in "Manual H-8110" and "National Register *Bulletin* 38." ER136-37; ER143-44; *see also* ER133 (PA requiring BLM to "identify historic properties" such as "non-archaeological locations or other features identified as important through tribal consultation or ethnographic studies").

15

This is also why BLM and Intervenor repeatedly confirmed that they *must* conduct a cultural landscape study as expressly "required by the PA." ER294. Indeed, in direct response to Plaintiffs' 2018 comments raising serious concerns with the Class III survey's failure to identify TCPs, BLM responded by acknowledging that, in fact, the agency had "agreed to do [a cultural landscape study] separate from the class III [archaeological survey]," and it "expect[ed] to have a separate report for the cultural landscape study." ER227. Yet, BLM never conducted *any* study prior to the LNTPs—let alone provided any "separate report," *id.*—that could, or actually did, identify TCPs. Hence, the district court plainly erred in holding that the PA "did not obligate BLM to conduct a cultural landscape study," ER016, and that "Plaintiffs did not voice concerns about the adequacy of BLM's efforts to identify TCPs." ER017.

Second, contrary to the holding below, *see* ER017-19, because BLM failed to utilize established methods (as required by the PA and as recognized by Manual H-8110 and National Register *Bulletin* 38) to identify TCPs in the first instance, BLM necessarily did not consider measures to avoid effects to any TCPs. That will only occur after BLM, on remand, properly identifies TCPs through a cultural landscape study and other established methods for doing so.

Finally, BLM's post hoc, contorted reading of the PA's statement that "[a]voidance measures for cultural resources may include (but are not limited to) *realignment of the transmission line*," ER136 (emphasis added), supports the Tribe's NHPA challenge. The district court accepted BLM's assertion—which is found

16

nowhere in the administrative record—that "realignment" must be limited to "'changing the position or direction of something *slightly*.'" ER011-12 (emphasis added). But nothing in the PA itself so severely limited the plain meaning of "realignment," and the district court's invented limitation ignores multiple dictionary definitions recognizing a much broader meaning. *See, e.g.*, Oxford English Dictionary (2008) (defining "realignment" as "[t]he action of realigning something"; "a new or further alignment"). Moreover, even if "realignment" were so limited, the PA expressly states that appropriate avoidance measures *are not limited to realignment.*

Regardless, BLM's intent when it drafted the PA—which must be construed *against BLM*—was that the PA process would be "broad enough and flexible enough to allow for **all manner of avoidance** *and mitigation.*" ER127 (emphases added). As courts have held in other cases involving BLM's post-ROD TCP identification obligations, where a PA "is ambiguous, that provision should be construed against the drafter of the [PA], in this case the BLM." *Battle Mountain Band of Te-Moak Tribe of W. Shoshone Indians v. Bureau of Land Mgmt.*, 302 F. Supp. 3d 1226, 1235 (D. Nev. 2018); *see also id.* at 1238-39 (relying on BLM's statements in finding that "[a] reasonable person could interpret [those] statements as promising" certain commitments).

In sum, because the district court's novel limitation of realignment to "slight" adjustments cannot be reconciled with BLM's commitment to consider "*all manner* of avoidance," ER127 (emphasis added), and also subverts the NHPA's directive that consultation be completed "early" enough so that "a broad range of [avoidance]

17

alternatives may be considered," 36 C.F.R. § 800.1(a), (c), BLM arbitrarily constrained its consideration of avoidance alternatives under the NHPA.[7]

Accordingly, Plaintiffs are likely to prevail, and have at least raised serious questions, as to their right to challenge BLM's clear-cut failure to identify and consider avoiding effects to TCPs.

## II. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

The district court did not reach the issue of irreparable harm. But the record demonstrates that this intrusive Project will irreparably harm Plaintiffs' interests in preserving and protecting the intact, culturally significant landscape of the Valley.

Below, Plaintiffs submitted declarations explaining how construction of the Project is resulting in the desecration and destruction of lands that are crucial to the history, culture, and religion of the Tribes—harms that by their very nature are irreparable. *See Quechan Tribe of the Fort Yuma Indian Reserv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (finding irreparable harm to Tribal interests and issuing injunction in NHPA case where "the Tribe attaches cultural and religious significance" to affected areas and "the massive size of the project . . . and incomplete state of the evaluation virtually ensures some loss or damage").

---

[7] In 2013, BLM told Plaintiffs it would not yet discuss realignment to avoid cultural properties because "BLM is not in a position to reroute the SunZia line" prior to the ROD. ER127. Now, BLM takes the opposite position that the ROD precludes the subsequent consideration of any Project reroutes to avoid cultural resources.

Here, Joseph Anthony Burrell, a member of the San Xavier District of the Tohono O'odham, explains that the Project "will irreparably degrade the San Pedro Valley as a [TCP] and irreversibly impair the important historic, cultural, and spiritual values it provides to the Nation and all of its members." ER098. He concludes that:

> The direct impact of construction through our village sites will adversely impact our ability to learn about, connect with, and pay tribute to our ancestors in these historic areas. Moreover, the indirect and cumulative impacts that will result from construction—such as the extensive disturbance to our sacred plants, animals, and waters caused by the towers and miles of roads to be built—pose an existential and irreversible threat to the continuity and maintenance of our distinct cultural identity as O'odham.

ER105. Likewise, Vernelda Grant, a member of the San Carlos Apache Tribe and its Tribal Historic Preservation Officer ("THPO"), states that "[n]one of the mitigation measures proposed by BLM will preserve or protect the Project area, its cultural properties or artifacts, or its environment," ER178. She further states that:

> As the [THPO] and in my professional opinion, the Project will disturb ancestral human remains that are buried in the area, increase the potential for looting of archeological and cultural artifacts and materials in the nearby public lands, and *forever harm the Apaches*, the families that come from the area, us as professionals that work to protect these culturally significant places, property and materials, and our entire tribal community. All these things will be *negatively and permanently affected*, broken and destroyed. The killing of a unique eco-system, as present in the San Pedro Valley, *can never be mitigated and can never be reproduced*. In Apache belief, the destruction and desecration of a place that ex[]udes so much life like the San Pedro Valley, will harm Apaches mentally, physically and spiritually. It seems that our lives, as human beings, are not being considered as important or valuable.

19

ER179 (emphases added); *see also* ER107-12 (declaration of San Carlos Apache Chairman Terry Rambler); ER228-39 (supplemental declaration of Vernelda Grant); ER257-69 (declaration of Peter Steere, THPO for the Tohono O'odham Nation).

Moreover, Plaintiffs submitted photographs, maps, and other evidence demonstrating the Project's ongoing, irreparable harm to the Tribes' ancestral lands and their interests in those lands. *See* ER113-26; ER240-51.

Accordingly, Plaintiffs have amply established irreparable harm to their interests in the absence of an injunction pending appeal.

## III.   THE EQUITIES AND PUBLIC INTEREST TIP SHARPLY IN FAVOR OF TEMPORARILY DELAYING CONSTRUCTION

Balanced against the irreparable harm to Plaintiffs' interests in historic, cultural, and religious properties of immense importance, are the limited economic harms that Intervenor might incur during the short window when temporary relief would be in place pending resolution of Plaintiffs' appeal.

As this Court has repeatedly held, the balance tips sharply in plaintiffs' favor where, as here, "the harms they face are permanent" and "intervenors face [only] temporary delay." *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *see also Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1156 (D. Mont. 2004) (issuing tribes an injunction in an NHPA case and noting that "[a] third party's potential financial damages from an injunction generally do not outweigh potential harm to the environment").

20

Moreover, any potential harm to Intervenor is further reduced by the fact that this Court has now set a highly expedited briefing schedule for the merits of Plaintiffs' appeal, in which briefing will conclude by June 26, 2024—i.e., less than eight weeks from now. Thus, any delay-based costs that Intervenor might incur will be relatively nominal during the short window in which the Court is considering this appeal.

In addition, the public interest strongly supports temporary relief. Congress determined that "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency" and that "the preservation of this irreplaceable heritage *is in the public interest*." Pub. L. No. 89-665, *amended by* Pub. L. No. 96-515 (emphasis added); *see also Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public."). It necessarily follows that "[s]uspending a project until that [careful] consideration occurs comports with the public interest." *S. Fork Band Council of W. Shoshone of Nev. v. Dep't of the Interior*, 588 F.3d 718, 728 22 (9th Cir. 2009). Hence, maintaining the status quo pending appeal promotes the significant public interests in cultural resource preservation and Tribal sovereignty, and prevents irreparable harm to important cultural resources in the Valley.

## CONCLUSION

Because Plaintiffs are entitled to relief pending appeal, the Court should enjoin construction to halt irreversible harm to Tribal culture, history, and religion.

21

Respectfully submitted,

/s/ Howard Shanker
Howard Shanker, Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

*Counsel for the Tohono O'odham Nation*

/s/ Alexander B. Ritchie
Alexander B. Ritchie, Attorney General
(202) 618-1007
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
alex.ritchie@scat-nsn.gov
(928) 475-3344

*Counsel for the San Carlos
Apache Tribe*

/s/ William S. Eubanks II
William S. Eubanks II
Elizabeth L. Lewis
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
bill@eubankslegal.com
lizzie@eubankslegal.com
(202) 618-1007

*Counsel for Center for Biological Diversity
and Archaeology Southwest*

22

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d) and

Circuit Rules 27-1(1)(d) and 32-3(2) because it has 5,573 words, which divided by 280

does not exceed the designated 20-page limit. This motion also complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of

Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally

spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ William S. Eubanks II*
William S. Eubanks II

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2024, the foregoing emergency motion for an injunction pending appeal was filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system and that a PDF copy of this motion will be emailed to opposing counsel immediately after it is filed.

/s/ *William S. Eubanks II*
William S. Eubanks II